Gladys Kirby FISHER, Appellant,

v.

Harold Martin FRANKE, Appellee.

No. 7077.

Court of Civil Appeals of Texas.

Texarkana.

Feb. 3, 1959.

Rehearing Denied March 3, 1959.

Frank Abraham, Robert L. Steely, W. James Kronzer, Hill, Brown, Kronzer & Abraham, Houston, for appellant.

William R. Eckhardt, Vinson, Elkins, Weems & Searls, Houston, for appellee.

PER CURIAM.

Plaintiff, Gladys Kirby Fisher, sued Harold Martin Franke, defendant, to recover damages for personal injuries allegedly sustained as a result of a rear-end collision occurring on February 18, 1955, on Post Oak Road in the city of Bellaire, Harris County, Texas. Trial was to a jury upon special issues. The jury in response to the 13 special issues submitted found in effect as follows: (1) That defendant did not fail to keep a proper lookout, etc.; Issue No. 2 on proximate cause was not answered; (3) that defendant did not fail to make proper application of his brakes, etc.; Issue No. 4 on proximate cause was not answered; (5) that defendant was not operating his truck at a rate of speed in excess of that at which a person of ordinary prudence would have operated same, etc.; Issue No. 6 on proximate cause was not answered; (7) that defendant was not operating the truck more closely behind the traffic ahead of him than would have been done by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances; Issue No. 8 on proximate cause was not answered; (9) that the collision of February 18, 1955, was not the result of an unavoidable accident; (10) the issue on the amount of damages for personal injuries sustained by plaintiff was answered by the jury at the sum of $7,300; and by their answers to Special Issues Nos. 11, 12 and 13, the jury in effect found that plaintiff would need to incur future medical expenses in the sum of $250, which would be the usual and customary charges in Harris County, Texas, etc. The trial court entered judgment for defendant upon the verdict of the jury. Plaintiff's amended motion for new trial was overruled and plaintiff has appealed.

By her Points 1 to 7, inclusive, appellant contends that the trial court erred in refusing to grant a new trial because the answers of the jury to Special Issues Nos. 1, 3, 7 and 9, and the failure of the jury to affirmatively answer the proximate cause issues Nos. 2, 4 and 8, were so contrary to the overwhelming weight and preponderance of all the evidence as to be clearly wrong and unjust. By her Points 8 to 13, inclusive, appellant complains of alleged improper and material misconduct of the jury. In connection with her points appellant sums up her position in her brief as follows:

"As the Court can see from the above, Plaintiff's complaints concerning the findings of the jury proceeds on two premises: First, the findings that Defendant kept a 'proper lookout', made a 'proper application of his brakes,' was not 'following too closely,' and that the collision was the result of an 'unavoidable accident' are so contrary to the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust; and, second, the undoubted reason for these incredible findings lies in

misconduct of the jury involving a discussion of the fact that Defendant had no insurance, that the jurors should place themselves in his position, that there was no such wrong as 'following too closely,' that findings on the issues would result in criminal prosecution of Defendant and that their findings to the 'liability issues' would be immaterial if they affirmatively answered the 'damage' issues.

"As stated, because of the gross inadequacy of the damage award resulting, we submit, from the obvious 'misconduct' of this jury, Plaintiff did not file a motion for judgment *non obstante,* limiting our claim for relief below, and here, to an order remanding the case for a new trial. During our discussion of the authorities reference will be made to decisions holding that *as a matter of law* findings such as those made by the jury here are not supportable. That fact, however, does not militate against the contention of the Plaintiff that the verdict was so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust for the reason that cases holding that there is 'no evidence' to support findings would be much stronger authority than cases dealing with the insufficiency of the evidence to support the findings. See, for example, Gulf Colorado & Santa Fe Railway Company v. Deen, Tex.Sup.1958, 312 S.W. 2d 933; 317 S.W.2d 913. Since the primary approach will be predicated upon the factual insufficiency of the evidence to support the verdict, it is and will be necessary for Plaintiff to review the entire record to demonstrate her contention that in this particular case a clear injustice occurred."

A question as to whether the verdict of a jury is so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust requires a court of civil appeals, in the exercise of its powers under the constitution and the rules of procedure, to consider and weigh all evidence in the case and to set aside the verdict and remand the cause for a new trial, if it concludes that the verdict is manifestly unjust, and such action is to be taken regardless of whether the record contains some evidence of probative force in support of the verdict. See In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661, where it is stated:

"* * * The question requires the Court of Civil Appeals, in the exercise of its peculiar powers under the constitution and Texas Rules of Civil Procedure Nos. 451, 453, and 455, to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict. See cases cited, supra. The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict.

\* \* \* \* \* \*

"It is, indeed, not simple to describe the intellectual process to be followed by the Court of Civil Appeals in passing on the fact question—to specify just how a verdict may be supported by evidence of probative force and at the same time be on all the evidence so clearly unjust as to require a new trial. But Article 5, § 6 of the Constitution, Vernon's Ann.St., is no more to be ignored than any other part of that document, and that provision, with the decisions, statutes and rules based upon it, requires the Court of Civil Appeals, upon proper assignment to consider

906

the fact question of weight and preponderance of all the evidence and to order or deny a new trial accordingly as to the verdict may thus appear to it clearly unjust or otherwise. This is the meaning given the constitutional phrase 'all questions of fact brought before them on appeal or error' of Sec. 6, supra. But for that interpretation there would be no 'questions of fact' for the Court of Civil Appeals to determine, since it cannot as a matter of law on conclusive evidence or lack of evidence, determine factual issues as a basis for rendering judgment. See Wisdom v. Smith, supra [146 Tex. 420, 209 S.W.2d 164], and similar holdings."

■ The only witnesses testifying as to the manner in which the accident occurred were the plaintiff and the defendant. Plaintiff testified to the effect that the accident occurred on February 18, 1955, between 4:30 and 5:00 o'clock, P.M., near the intersection of Post Oak Road and Tamarisk Street, on a dry day, when she was riding in her automobile which was driven by a friend, and that as they got close to Tamarisk Street (which is north of the intersection of Post Oak Road and Richmond) there were a number of cars that were stopped facing a red light at Richmond and the driver of her car brought same to a stop in the line of traffic which she estimated to be comprised of ten cars; that she stated that her car was not abruptly stopped and that it "seemed like we had been stopped there a long time" before the accident occurred. Plaintiff further testified that after they had been sitting there "some several moments" waiting for the light to change the vehicle in front of them began to move and just when she thought "it would be time for us to move there was this terrific crash in back of us and I flew up into the air and I twisted some way and I came down in a daze," and that there was no warning given and it was "just an immediate crash." The record also shows that there were no traffic signal controls at Tamarisk and Post Oak and the stopping of plaintiff's car in the lane of traffic was due to a red light at the intersection of Richmond and Post Oak, approximately two-and-a-half or three blocks to the south of where the accident occurred. Plaintiff did not see the collision; stated she did not know "what caused this accident to happen" and that all she knew was that there was a "collision whereby the rear end of her car was struck."

Defendant's testimony with reference to the accident was by deposition and by appearance on the witness stand. Defendant's testimony as to the time and place of the accident are in general accord with the testimony of plaintiff.

Defendant's explanation of the accident at the time of his deposition which was taken a year-and-a-half prior to the trial, which testimony was introduced in evidence, was as follows:

"Q. Would you tell us what happened, Mr. Franke, please sir? A. To the best of my recollection, I—well, I had an awful cold, and when I have a cold I get coughing spells, and I started to cough. I know I was coughing at the time of the impact, and whether that—that must have caused me to look away, and the first thing I knew the cars were right in front of me.

"Q. Were the cars stopped? A. The cars were stopped. The car immediately ahead of me was stopped.

"Q. I see. Now, if I follow you right you started up and you were coughing and you—and after you started up and before the impact you started coughing? A. Yes.

"Q. And then you looked away. Were you looking for cough drops?

A. I looked for cough drops. That is exactly what happened. And, of course, the cough drops were in the pocket, and afterwards when they pulled the cars away the box was lying in the bottom of the car and cough drops all over it.

"Q. You don't know whether or not you had dropped your cough drops before the— A. I know I hadn't because they were in my pocket. I know definitely they were in my pocket before the impact. And there was nothing else in my pocket, so I must have pulled them out at that time.

"Q. It was while you were attempting to get the cough drops out of your pocket that you looked back and saw the car in front of you had come to a stop? A. Yes.

"Q. Did you attempt to apply your brakes before you had the impact? A. Yes, I did apply my brakes.

"Q. Did your car skid? A. I couldn't answer that truthfully. The officer that came there, he checked, and I can't truthfully say that there was some skid marks or that there wasn't any skid marks.

"Q. You remember his statements out there at the time of the hearing, at the time of the hearing at the— A. It seems to me it was about ten foot behind the truck, ten or fifteen foot behind the truck. It seems to me there was some skid marks that was there, but truthfully I couldn't say.

"Q. Do you know how fast you were traveling at the time you first saw the cars stopped in front of you? A. I would say not more than 20—well, not much more than that. It couldn't be more than 20 miles an hour, because there is traffic on that street at that time.

"Q. How far was the car in front of you at the time you saw it before you looked away? A. From normal driving habits I would say, from 30 to 35 foot ahead from me.

\*    \*    \*    \*    \*    \*

"Q. In any event, the car was stopped when you did see it, when you applied your brakes? A. Yes.

"Q. And you don't know at this time how long it had been stopped when you first saw it stopped? A. No, I couldn't say how long it had been stopped.

"Q. Now, then, when you did see it, and you applied your brakes, you proceeded to hit the rear of this car? A. Yes.

"Q. Now, can you tell me sir, what make and model of car your pick-up truck hit? A. I believe it was a Ford, the model I could not say.

"Q. Did you later find out who was driving and operating that car? A. He gave me his name.

"Q. Was it Mr. J. C. Abrell? A. Abrell was the name, the initials I couldn't vouch for.

"Q. From San Marcos, Texas? A. That was it.

"Q. Do you know what happened to his car when you hit it? A. Well, I pushed in the back end slightly, and it seems to me his front had more damage than the rear.

"Q. Well, do you know what caused the damage to the front of his car? A. Well, my car knocked his car forward into the rear of the car ahead of it.

"Q. I see. *Now, the car ahead of you, or the car ahead of the Abrell*

car, was the car in which Mrs. Fisher was riding in, is that right? A. Yes.

"Q. And did you immediately get out of your car? A. Yes sir.

"Q. Your truck? A. Yes.

"Q. Which side of the street did you get out on? A. I got out in the middle of the street.

"Q. I see, and what did you do then? A. Well, I walked to the car ahead of me and by that time Mr. Abrell was out of his car and he immediately said that he would have to get a—call an officer and I looked and asked the ladies sitting in the car if they were alright, then I walked up to the car.

\*    \*    \*    \*    \*    \*

"Q. Did you have any further conversation with Mrs. Fisher after that one time when you asked her if she was alright? A. No, I just told them afterwards—I gave them my name and that, and they were sitting in the police car and I told them that I was sorry I caused them any—

\*    \*    \*    \*    \*    \*

"Q. That, you were driving along and you begin coughing and that you looked for your cough drops or looked away from the road and that you looked back up and the car in front of you had come to a stop and you applied your brakes and you crashed into the car in front of you? A. Yes.

"Q. Is that a fair summation of your testimony, Mr. Franke? A. Yes.

"Q. And that's what happened anyway, isn't it? A. Yes, that's what happened." (Emphasis ours.)

Defendant was a witness on his own behalf at the trial and testified at length. We quote from portions of his direct testimony on the witness stand as follows:

"A. When we started out there I followed a normal flow of traffic, which was not moving very fast, not more than 20 or 25, about 20 miles an hour and I had caught a severe cold and I got a coughing spell and in coughing that perhaps distracted me from my wheel, just the coughing, and that distracted me and the first thing I knew cars were right in front of me and I put on the brakes.

"Q. Now what was the fastest speed you got up to before the time of the collision, from the time that you left the red light to the time of the collision? A. Not more than 20 to 22 miles an hour. I could not possibly have been faster than that.

"Q. At the time that this coughing spell started, could you see how far you were behind the cars which was immediately ahead of you on the highway? A. From the time it started, from normal driving habits I never followed much closer than 35 to 40 feet. Thirty to 35 to 40 feet behind another car.

"Q. At the time this coughing spell started—is that the reason you were behind the car in front of you? A. I would say yes.

"Q. Now how violent was this coughing spell you had? A. Severe enough not just a small cough like that (indicating) a severe cough that it would say something perhaps like a sneeze, kinda like when you are in a convulsion.

"Q. Was it severe enough to cause you to involuntarily move your head? A. That it did, that it did.

"Q. *Did it interfere with your vision ahead of you?* A. *It did yes.*

"Q. How long was it the best that you could tell us from the time you started coughing until the actual impact occurred? A. Not more than a few seconds.

"Q. Now just before the time that you had this coughing spell were you looking ahead of you on the highway? A. Yes sir.

"Q. Could you see at that time if traffic was moving along? A. The car immediately ahead of me was moving, the last that I saw of it at that point.

"Q. Did it appear to be moving as fast as you were or at a different speed? A. As fast as I was.

"Q. Now Mr. Franke was any traffic coming out of Mayfair Street—excuse me, I mean Tamarisk Street? A. Not that I can truthfully say. I don't know if it was or not.

"Q. Is Post Oak Road a main road across that area? A. Yes sir one of the few roads that goes North and South.

"Q. When you had this sudden violent coughing spell, what did you do? A. Took my foot off the accelerator and I imagine I was just coughing and there was the car ahead of me and I put on my brakes. That was the first thing I thought of doing and *one of the first things I thought of doing was getting a cough drop and I went to reach for a cough drop in my shirt pocket.*

"Q. Did you have some cough drops in your shirt pocket? A. I had a box of cough drops in my pocket.

"Q. Now when you saw that car was stopped ahead of you how far away were you from it at that time?

A. I couldn't tell you. I know it was there and I put on the brakes immediately, but how far it was, I really couldn't say.

"Q. Did you actually get your brakes on before the collision? A. *I believe so.*

"Q. Now Mr. Franke, what caused you to collide with the rear end of this other car? A. *Well, the primary reason for it was I would say was the coughing. My failure to stop because of coughing being distracted, what I mean is being too close to it and he stopped suddenly ahead of me.*

"Q. Would this accident have happened if you had not had this violent coughing spell? A. No.

"Q. Now what part of your car hit what part of the car ahead of it Mr. Franke? A. My bumper hit the rear of the car ahead of me, my bumper hit his bumper.

\*    \*    \*    \*    \*    \*

"Q. *Now, Mr. Franke, when you started this coughing spell, why didn't you put on your brakes? A. Well, the reason I didn't put on the brakes if I would have stopped suddenly the car behind would have perhaps done the same thing to me that I had done to the car ahead.*

"Q. Did you know at the time you had this coughing spell that the car ahead of you was going to stop? A. No, there was no way of telling that."

We quote from defendant's testimony on cross-examination as follows:

"Q. *And in reaching for your cough drops you got distracted and looked up and the vehicle in front of you was stopped? A. Stopped or stopping, I had no way of telling just exactly what.*

**910**

"Q. In your deposition I believe you testified before that it was stopped when you first saw it. A. That is exactly what I mean. I said it was stopped and I believe it was stopped by the time I seen it.

"Q. So there will be no misunderstanding about it there are several places here in the deposition like on page 8, 'Question, were the cars stopped? answer, the cars were stopped, the cars immediately ahead of me were stopped' is that what you said at that time? A. I believe it was.

* * * * * *

"Q. You skidded your vehicle some 39 feet did you not? A. I have no idea.

"Q. You were there when the officers measured it were you not? A. Yes sir.

"Q. And would you swear under oath you did not skid your vehicle as far as 39 feet? A. No I would not.

* * * * * *

"Q. Now state to us if you will sir, and by your own best recollection whether or not you told the investigating officer or the patrolman that investigated this accident that immediately prior to this accident you were looking to your left at the construction of that Catholic school that was going on and the progress that was being made. A. I did not state I was looking there. He wanted to know what happened and I said it was coughing and it was coughing and *I may have looked over there and I may not have.*

"Q. Thank you sir. *Now you said you might have been looking over at* the construction? A. *I didn't say I was, I said I might have looked over there.*

"Q. Do you know anything in the world that Mrs. Gladys Fisher did wrong to cause this accident? A. Not that I know of.

"Q. Do you know of anything in the world she could have done to have avoided the accident? A. I don't know how I could answer that. What could I say to that?

"Q. You could say there was not. Thank you and I believe that is all." (Emphasis added.)

Following the rules outlined in the case of In re King's Estate, supra, we have carefully considered all of the evidence in this case, and have reached the factual conclusion that the answers of the jury to Special Issues Nos. 1, 3, 7 and 9 are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust, and we also find that the failure of the jury to affirmatively answer Special Issues No. 2, 4 and 8 is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. We sustain appellant's Points 1 to 7, inclusive, and the judgment of the trial court is reversed and the cause is remanded for a new trial.

In view of the fact that the cause must be reversed and remanded for the reasons above given, we deem it unnecessary to specifically pass upon appellant's points with reference to jury misconduct as these matters will not likely arise again upon another trial.

Reversed and remanded.